**ALLEN–BRADLEY CO. v. SQUARE D CO.**

No. 16098.

District Court, N. D. Illinois, E. D.

Aug. 15, 1945.

Edwin B. H. Tower, Jr., of Milwaukee, Wis., and Samuel W. Kipnis, of Chicago, Ill., for plaintiff.

Thiess, Olson & Mecklenburger, of Chicago, Ill., for defendant.

HOLLY, District Judge.

Allen-Bradley Company charges the defendant with infringing claims 2, 20, 21, 22, 23, 24 and 26 of its Wilms and Petersen patent No. 2,071,149 for improvements on a solenoid starting switch for electric motors.[1] In its complaint plaintiff also charges defendant with infringing its reissue patent No. 20,676 but in its reply brief stated that it desired to withdraw the latter patent from suit. Defendant resists the motion and asks to have the questions of validity of the patent and its infringement thereof adjudicated. Those questions will be taken up later.

I. The claims of the Wilms and Petersen patent No. 2,071,149 included in this litigation relate to a design of a hood enclosing the contacts of the electric switch. In the brief filed with the Court claim 21 was stated to be typical but on oral argument counsel for plaintiffs stated that claim 22 perhaps should be considered as the one typical of the invention claims.[2]

The hood of the patent is entirely closed, except for a single opening in the bottom wall. The switch is of the 3 pole type, having double-break contacts. The movable contact is mounted on a bridging bar, and the contacts are so arranged as to form a magnetic loop to spread the arcs apart from each other. The movable contact holder is actuated from without the hood, and the contact holder passes through a hole in the bottom of the hood, substantially closing the opening, the opening being only sufficiently

---

[1] The patent included many other features not involved here.

[2] Claim 22 is as follows: In an electric switch for industrial control service, two spaced stationary contacts, a bar movable with substantially a translating motion toward and from the contacts to electrically bridge the same, conductors leading to the contacts from a direction opposite to the approach of the bar, an arc-enclosing chamber enclosing said contacts and bar, said chamber having but a single opening leading thereto, a carrier assembly for moving the bar to and from the contacts and having a part movable through said opening and substantially closing the same, said relative positions of the bar, contacts, and conductors being such as to cause arcs drawn between the contacts and bar to move outwardly away from each other in a definite direction towards opposite walls of the chamber, and the internal dimensions of the enclosure being such that its walls lie closely adjacent to the contacts and bar whereby the outwardly projected arcs impinge said opposite walls to produce a quenching effect upon the arcs, and the clearance between said part which moves through the opening and the walls of the opening being sufficient to facilitate the escape of accumulated gases from within the chamber but close enough to confine the arc within the chamber.

428

large to permit the contact to slide easily through it.

The general design of the switch appears from the illustration showing a longitudinal sectional view of the portion of the hood enclosing a single pole.

Fig. 2.

The numeral 8 designates the fixed contacts and 37 the movable contacts which are mounted upon a bar 34. Below the bottom of the hood is a contact carrier 20; a boss 24 projects from the top of the carrier and has a metal post 25 imbedded therein. Seated on this post 24 is a spring-retaining cup 27 in which the lower portion of an expansible spring 28 is nested. Telescoped over this is an outer cup-shaped member 31 upon which rests a bar 34 which carries the movable contacts. This cup member 31 passes through a hole in the bottom wall of the hood, and the hole is described in the patent, p. 3, line 36, as being of a size just sufficient to permit free sliding action.

The plaintiff's invention and its workings are described by its counsel in their brief as follows:

"The Wilms and Petersen starting switch embodies a new combination never before disclosed or contemplated in the prior art comprising:

"Two stationary contact holders and a movable bridging contact arranged to form a magnetic loop to spread the arc apart from each other.

"A contact carrier provided with a contact-holder to carry and actuate the movable contact, and

"A hood enclosing the contacts in an arcing chamber to confine dangerous arcing gas therein during the arcing, and provided with an entrance opening having the contact-holder (the cup 31) passing therethrough to actuate the movable bridging contact and forming a vent to allow harmless high-density gas to escape during the arcing under the expansion of the high temperature low density gas and thereby cause fresh air to enter the arcing chamber upon the arcing subsiding."

Plaintiff's witness Hammer in response to the question, "What are the essential and principal characteristics in the structure of the Wilms and Petersen switch which distinguish it from the references you have discussed?" replied, "Well, the Wilms and Petersen structure has the three elements to which I have referred; namely, the double break with its consequent arc dispersal U-shaped circuit as one element, or set of features; then the second general element is the closed chamber which confines the arc, does not permit it to escape; and the third is the actuator outside of the chamber but having a part projecting through an opening in the bottom of the chamber and serving to move the contacts within the chamber. The size of the opening in relation to the size of the parts passing through that opening is such that the opening will serve as a vent but only as a vent for innocuous gases and not as a vent for the dangerous gases." (p. 10)

The history of the Wilms and Petersen patent No. 2,071,149 is a curious one. Plaintiff at the time of its application for this patent was the owner of Wilms and Dawe patent No. 1,981,534 which covered a design for a hood enclosing double break contacts which was of practically the same design as that described in the Wilms and Petersen patent except that in the Wilms and Dawe patent the bottom of the hood was left open and the springs which supported the movable contacts were not enclosed in telescoping cups.

The original application for the patent in suit was filed July 11, 1935. In the ap-

plication the inventors stated its objects, among others, to be :[3]

"It is a general object of this invention to improve the construction of switches of this character and to increase their rupturing capacity through the provisions of wall arc hoods which *completely enclose* the contacts.

"Another object of the invention is to provide an arc hood so constructed that while it *completely encloses* the contacts they are readily accessible for inspection. * * *

"Another object of this invention is to provide practical means for actuating the movable contacts from the enclosed arc hood in such a manner that the *completeness of the enclosure* is not destroyed."

The effect of this completeness of the enclosure, as stated in the application, is that "the arc which tends to form on the opening of the switch is suppressed and effectively extinguished by virtue of the *completeness of the enclosure* in which the contacts are disposed and to provide the maximum wall surface for each of the three individual compartments to insure quick cooling, the front and rear walls of the compartments are provided with shallow cavities." (File Wrapper page 25.)

In the application claim 1 reads as follows: "In an electric switch including stationary and movable contacts, a *completely enclosed chamber* in which said contacts are disposed, one wall of said chamber having a hole therethrough, and means entering said chamber *through said hole to mount* the movable contacts for movement in a straight line to and from engagement with the stationary contacts."

Claims 2, 14, 26 and 49 also embraced the idea of complete enclosure. On August 12, 1935, those claims were rejected as being fully met by Ancotti No. 1,130,111, which also showed complete enclosure.

On February 19, 1936, Wilms and Petersen filed new claims and in remarks accompanying these claims they said (File Wrapper, p. 82):

"To keep in step with a modern demand for compactness, some means had to be provided for increasing the switching capacity without the heretofore necessary increase in all dimensions. Arc suppression was the answer. *Past experience dictated complete enclosure of the contacts to effect that end,* but the need for accessibility of the contacts was paramount and at one stroke eliminated all past construction from consideration. While complete and total enclosure of the contacts was needed if, acquired at the expense of accessibility, the switch would be a failure * * *.

"Thompson and Ancotti show switches with enclosed contacts but these past constructions were utterly out of the question and could not without the exercise of invention, be modified to meet the requirements of the present day motor starters."

They stress the necessity for accessibility then and say (p. 84): "added to those necessary qualifications, which are centered primarily about the contact enclosure, is the necessity for providing some adequate and simple mechanisms for actuating the movable contacts from the exterior of the enclosure without destroying the completeness of the enclosure * * *."

Further, they stated: "The switch of this invention * * * does obtain these desirable results (enclosure and accessibility) by providing an enclosure so designed and constructed that access may be quickly had to the contacts for inspection by merely loosening the nuts and without having the entire assemblage fall apart and by so designing the actuator for the movable contacts a minimum mass is acted upon by the contact springs."

Wherever the opening in the bottom of the hood is mentioned in specification, the claims or comments to the Examiner, it is coupled with the statement that the opening is substantially enclosed by the slideable member which passes through it. Nowhere, up to this point, is venting mentioned.

Certain of the new claims were rejected by the Examiner and other claims added. Meantime defendant had placed upon the market the device which plaintiff now charges infringes its patent. Subsequently, on October 16, 1936, plaintiff amended its claims in certain respects, for the first time mentioning venting of gases.

The specifications were also changed to recite (File Wrapper 107) that the necessary opening in the bottom wall through which the actuating member passed "communicates the chamber interior with the atmosphere and enables substantially a *rapid* venting of accumulated gases from

---

[3] Wherever emphasis is shown in a quotation the emphasis is mine.

within the chamber." Further, to the recital in the original specification that one of the objects of the invention is to provide practical means for actuating the movable contacts from without the closed arc hood in such a manner that the completeness of the closure is not destroyed, plaintiff added the words "to the point of interfering with the effective confinement of the arc within the chamber but it is to be observed that the clearance between the cup member and the wall of the holes is sufficient to facilitate or enabling *rapid* venting of accumulated gases from within the chamber."

These amendments were accompanied by a statement (File Wrapper 109) that while it was not positively known just what produces the exceptional arc extinction obtained with this switch, tests indicate and it is thought to be "the close confinement of the arc to *produce a suppressing pressure,* cooling of the arc by contact with closely adjacent wall surface, the deionizing effects of the metal of which the contacts are composed and the *rapid* venting of the *accumulated gases after the extinction of the arc* which brings the desired results."

As the claims stood until the amendments of October 10, 1936, plaintiff could not have maintained this action. It admitted that complete enclosure was old and the enclosure here was of the same order as in Thompson and Ancotti cited by the Examiner. Something additional was needed and it was added by the theory of the venting of the accumulated deleterious gases after the extinguishment of the arc.

Following these amendments there appears to have been an oral interview with the Examiner but no record was made of this interview and the court is completely in the dark as to what occurred. A file wrapper should give a complete history of what occurs in the Patent Office. Too frequently it shows objections to claims, then an oral interview followed by an allowance for which no reason is given and the court is left without information as to what influenced the Examiner to grant the claims.

Upon the trial the theory of the rapid venting of the accumulated deleterious gases was abandoned. Plaintiff's expert witness Simon testified (Rec. 152) that when the arc is formed on the separation of the contacts the gas is heated to a high temperature which causes the air to expand and its density is thereby greatly decreased; the gas is crowded against the walls of the switch, the gas molecules are pressed closer to each other so that while the arc exists, there is in the switch a bubble of very low density (highly heated) air surrounded by a layer of high density (cooler) air, which is of a higher density than the normal air existing in the hood prior to the existence of the arc. It has the characteristic that any ionization that might exist in this high density air will very rapidly disappear, so that when the current goes through zero there is no more heat supplied to sustain this low density bubble (hot gas bubble) which is enveloped by high density (cooler) gas and the high density gas rushes into this space between the contacts at a great velocity and restores in that space the dielectric strength of the air so as to prevent a restriking of the arc after the current has passed through the zero point of the cycle. While the arc exists in this switch there is also created by virtue of this expansion of the gas about the arc a pressure and this pressure causes some of the high density gas adjacent to the vent to be pushed out of the chamber. The air in passing through the vent is expanded to the pressure of the ambient air and thereby brought down to normal pressure 'and during this expansion it is cooled down to the temperature of the ambient air. The result is that *no* low density high conductivity gas, that is, gas of low dielectric strength which might create an arc and a flash over between different current carrying parts outside of the hood, escapes from the hood. As soon as the current stops, the arc stops, the low density bubble collapses and the high density air surrounding the low density bubble, and completely enclosing it, rushes into the low density spaces. A part of the air has been expelled through the vent so that now we have a deficiency of pressure in the chamber. This causes normal air from the outside to be sucked into 'the chamber, where the pressure is now lower than it is outside, and this normal air further cools the volume of air in the chamber and restores it to its normal condition. As the current reaches zero the low density air bubble collapses instantly as it has no appreciable mass to store heat and the high density gas rushes into the air gap between the stationary and movable contacts, "to restore in the gap the high dielectric strength so as to prevent a restriking of the arc."

In other words, according to Simon, what happens is that the hot gas in the center pushes the air surrounding it towards the walls of the hood, the high density air is heated and expands creating a pressure which forces this somewhat expanded but cooler air out through the vent, the pressure inside now being relieved, the cool air outside rushes in and strengthens the dielectric effect of the air inside, all of this having the effect of preventing restriking.

In the argument of the case counsel for plaintiff took still another tack. He said that the structure causes the air (the court assumes he meant the accumulated deleterious gases) to be throttled so they could not escape rapidly (as the patentee had asserted in the Patent Office) and that through the effect of the magnetic loop within the chamber resulting from relative arrangement of the parts within the hood and the close confinement of the arc within the hood, the arc was extinguished, high density air was expelled from the hood and fresh air sucked in, all of which prevented restriking and flash over. But I cannot see upon what evidence he bases his theory of throttling and it directly contradicts plaintiff's statement to the Examiner that the deleterious gases were rapidly vented.

The conflicting theories of the plaintiff as to the operation of its structure and the testimony of defendant's witnesses who, of course, disagreed with the theories of Simon and Eckels, caused the Court to feel that he needed the assistance of an independent expert.

Upon request, the parties agreed that the Court might call such an expert, with a stipulation that his report should be considered as evidence, either party to have the right to cross examine such expert, his fees to be taxed as costs in the case.

The Court thereupon asked Walter S. Huxford, Professor of Physics at Northwestern University in Evanston, Illinois, for such a report, and the entire record was made available to him.

He filed his report in Court and appeared for cross examination, but counsel, after reading the report, stated that they did not care to cross examine.

Professor Huxford in his references to the testimony of the expert witnesses produced by the parties said (Report, p. 3):

"Each party to the suit has introduced expert witnesses to give testimony on current rupturing capacity of the various switches in question. The reports of tests offered in evidence are usually presented in piece-meal fashion by the witnesses on the stand, and in most cases there exists no clearly documented laboratory report of the original data, and no adequate analysis of this data. For this reason it is difficult for a person even reasonably familiar with the techniques used in switch testing to interpret the findings and intelligently assess their value as evidence. It is apparent that the court must, therefore, rely largely upon the opinion of the witness as to what a given set of tests prove."

It is the opinion of Professor Huxford that any increase of pressure in the hood of plaintiff's switch on the interruption of the arc is a negligible factor in arc suppression within the enclosure; that the larger the area of the enclosing walls in the immediate neighborhood of the arc, the greater will be the cooling effect of the walls upon the hot gases generated by the arc, and with walls made of material which is highly heat-resistant the enclosed hood will cool the gases more effectively than a hood with an open bottom.

Further, said Professor Huxford, the cooling of a gas from 9,000 degrees F. down to, say, 3,000 or 4,000 degrees F., ensures that very few new ions are formed in the gas and "the rate at which ions disappear in a body of ionized gas is greatly increased when this gas is in close proximity to the surface of a solid. This effect has been measured in many laboratory experiments in which streams of ionized gases are forced to flow through tubes or vents of various sizes and lengths. Ions and electrons may disappear by the process of recombination with the body of a gas or by recombination with a solid surface; but the rate of disappearance of ions from a given volume of gas is enormously increased when the gas streams through a narrow vent over the rate at which ions disappear in the same volume of gas when held, say, in a cubical box. * * *

"Thus, very hot gases, gases which may be luminous and give a visible glow, may not contain enough ions to conduct current and set up an arc causing flash-over in a switch if those gases have escaped from the switch chamber through vents *which are eight or ten times as long as the smallest cross-section dimension.*" (Emphasis mine.)

Professor Huxford further found the use of a U-shaped loop in conjunction with the

double contact arrangement used in this type of switch tends to cause the two arc columns to separate from each other. This action drives the arc columns against the side walls, forces the cooler gases out of the vents and sets up a turbulence in the chamber which persists long enough to have a decided quenching action on the discharge and tends to break the arc near the current zero. The turbulence increases the rate of deionization of the hot gases which are present in the chamber at the point of zero current.

Wilms and Petersen did not, however, make any mention in their claims of turbulence increasing the rate of deionization of the hot gases. In claim 22 the statement is made that the relative positions of the bar, contacts and conductors is such as to cause arcs drawn between the contacts and the bar to move outwardly away from each other in a definite direction towards opposite walls of the chamber, the internal dimensions of the enclosure being such that its walls lie closely adjacent to the contacts and bar whereby the outwardly projected arcs impinge said opposite walls to produce a quenching effect upon the arcs. This is not a statement that turbulence increases the rate of deionization and it is quite indefinite as to the internal dimensions of the enclosure to produce the alleged quenching effect.

■ I am of the opinion that this patent is invalid for the following reasons:

1. The Wilms and Petersen patent does not show an invention. They designed a hood which is completely enclosed except for a single opening in the bottom through which the actuator passes. This is a mere mechanical device permitting the moving of the movable contacts into connection with the fixed contacts. Wilms and Petersen when they designed the hood had no other thought in mind than this. A mere opening as such has no deionizing effect. To have this effect the length of the opening must be of an order of eight to ten times the area of the smallest cross section dimension. Wilms and Petersen did not know this and consequently did not state it. They did not invent a device which would affect deionization. What they had in mind was a pushing out of accumulated gases and letting in air (which would be useless), not deionization through contact of the hot gases with surrounding surfaces as they pass through an opening having a length eight to ten times greater than the width.

2. The description of the alleged invention in the application for the patent is too indefinite. U.S.C.A. Title 35, Section 33, provides that before an inventor or discoverer shall receive a patent for his invention or discovery he shall make application in writing to the Commissioner of Patents and shall file in the Patent Office a written description of the same and of the manner and process of making, constructing, compounding and using it in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains or with which it is most nearly connected to make, construct, compound and use the same; and in the case of a machine he shall explain the principle thereof and the best mode in which he has contemplated applying that principle so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement or combination which he claims as his invention or discovery.

This case illustrates the wisdom of the provisions for definiteness. Here the description of the patent was so indefinite that the inventor could claim at one time a complete enclosure, at another an opening permitting rapid venting of the gases and at another a throttling which would prevent rapid but permit slow escape of the gases. Had a patent been issued on the original claims a hood of similar construction but with bushing which would effect absolute or nearly absolute enclosure of the opening would be an infringement. Such an arrangement would not be an infringement of the patent as issued. No dimensions were given by Wilms and Petersen as to the dimensions of the opening or of the actuator which went through it nor of the space which could be safely allowed for the escape of the accumulated gases without at the same time permitting flash-over.

■ 3. At the time defendant put its alleged infringing device on the market plaintiff's claims called for complete enclosure and the construction of the hood was such according, to their theory, that practically complete enclosure was secured. At that time the Patent Office had held, and Wilms and Petersen were admitting, that such enclosure was not patentable. Defendant was justified then in constructing such a hood and marketing it with the assurance that it was not infringing any invention of Wilms and Petersen. Upon the familiar principles of equitable estoppel

plaintiff should not now be allowed to change its position and to charge that it had a patentable device which defendant infringes.

II. As to reissue patent No. 20,676, plaintiff in its reply brief filed with the court stated that inasmuch as the main patent in suit claims the same motor starting switch described in reissue patent No. 20,676 it desired to withdraw the claims of the reissue patent.

Defendant objects to this and insists that the court determine the issues as to that patent as well as the main patent.

I have, therefore, examined that patent and find that it is invalid in that it does not disclose any invention over the Wilms and Dawe patent.

III. Defendant has filed its counterclaim charging infringement by plaintiff of the Jackson patent No. 2,143,697 and the Van Valkenberg patent No. 1,890,000. As to the Jackson patent defendant says in his brief:

"In our discussion of the '149 patent (ante pp. 81–93) we strongly urge that it did not amount to invention to enclose more completely the contacts of the Wilms and Dawe switch in order to produce the '149 switch. If the Court agrees with our position in this respect it must be conceded that more complete enclosure of the contacts in the Sachs switch to provide the substantially closed chambers of Jackson did not amount to invention."

I am of the opinion that the Wilms and Petersen patent does not infringe the Jackson patent and that the Van Valkenberg patent does not show invention.

Counsel may prepare and submit drafts of findings of facts and conclusions of law. I will hear them on August 15, 1945.